Filed 8/31/16  Marriage of O'Brien and Exley CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re the Marriage of LOIS O'BRIEN and RAY EXLEY | B262119 |
| LOIS O'BRIEN,<br><br>                     Respondent,<br><br>     v.<br><br>RAY EXLEY,<br><br>                     Appellant. | (Los Angeles County Super. Ct. No. BD468094) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Mark Juhas, Judge.  Affirmed.

Kaplan, Kenegos & Kadin, Jerry Kaplan and David Scott Kadin for Appellant.

Honey Kessler Amado and James A. Karagianides for Respondent.

Ray Exley (appellant) appeals from a final judgment entered after trial in this marital dissolution action. Appellant and Lois O'Brien (respondent) were married for one month, divorced, lived together for 14 years, then remarried for 15 years before divorcing again. This matter arises from the second divorce. We find no reversible error and affirm.

## CONTENTIONS

Appellant argues that the trial court lacked jurisdiction to enter the judgment due to the parties' failure to comply with Family Code section 2105 before trial.[1]

Appellant also argues that the trial court erred in failing to find the existence of an oral sharing agreement. As a result of this error, appellant argues that the trial court incorrectly divided several assets, including a house in Beverly Hills, pension plans, and artwork.

Finally, appellant argues that the trial court erred in failing to award him attorney fees under sections 271 and 1101 due to respondent's alleged undue influence in claiming the Beverly Hills house as her sole and separate property.

## FACTUAL BACKGROUND

Appellant and respondent met in 1973 in medical school. Appellant had just entered his anesthesiology residency at Stanford and respondent was a junior instructor in anesthesia.

The parties began living together when they purchased a home in Palo Alto in 1974 or 1975. The Palo Alto home was held in respondent's name because she was Stanford faculty, which made her eligible to purchase the home. Appellant testified that respondent provided the eligibility and he provided the down payment.

The couple married in April 1977 and filed for divorce approximately one month later. The divorce was finalized on May 22, 1978. Appellant testified that the reason for the first divorce was appellant's fear of liability from a medical malpractice insurance

---

[1] All further statutory references are to the Family Code unless otherwise noted.

2

exchange he was involved with. The parties continued to live together after the first divorce.

Appellant testified that around the time of the parties' first marriage, they made an oral agreement to share equally all of their assets. Appellant could not recall exactly when the agreement was made, but stated that it was discussed several times. Appellant testified that the agreement continued and was reaffirmed subsequent to the parties' divorce. Respondent denied the existence of such an agreement.

Sometime around 1978, respondent got a job in Los Angeles at UCLA. The Palo Alto house was sold.

Appellant's physical condition began to deteriorate and as a result in early 1982 he retired from active medical practice.

In 1982, when the parties were not married, they purchased the Beverly Hills house. Appellant testified that the parties negotiated a lease purchase option. Appellant produced evidence that he wrote a check on his account payable to the owner of the house for $15,600. The total cost of the house was approximately $700,000.

Respondent testified that she bought the Beverly Hills house herself and that appellant had no interest in the house at the time. The purchase was financed in part by a series of notes and deeds of trust. All of the notes and deeds of trust were signed by respondent alone. Respondent testified that appellant lived with her in the house, but that she made all payments. The note due the seller was paid in 1985 with two cashier's checks signed by appellant.

Respondent and appellant were living together in the Beverly Hills house when they married again in 1992. They continued living there after the second marriage as well.

The residence was refinanced in 1986. Title to the property was transferred to "Lois O'Brien, an unmarried woman, and Ray W. Exley, an unmarried man, as joint tenants." Shortly after their second marriage in 1992, the parties refinanced the residence again. The property was transferred to appellant and respondent, husband and wife, as joint tenants.

3

The residence was refinanced twice more, in 2002 and 2003. After the 2003 refinance, the title was changed to respondent's name alone. Appellant never asked respondent to put his name back on the title.

The parties continued living together in the house until respondent moved out in August of 2007.

## PROCEDURAL HISTORY

Respondent filed the petition for dissolution on June 21, 2007. Appellant's amended response was filed February 8, 2008.

On October 14, 2009, appellant filed a separate civil action entitled *Exley v. O'Brien*, Los Angeles Superior Court Case No. BC423736. In it, appellant alleged breach of an oral agreement concerning the ownership of property purchased during the time that the parties were not married. The trial court deemed the matter related to the dissolution action and it was transferred to the Family Law court. In November 2013, trial commenced on the civil action. After opening statements, appellant voluntarily dismissed the civil case with prejudice. The parties stipulated that all discovery produced in the civil action could be used in the dissolution action, subject to relevance and foundation.

On October 20, 2011, the trial court joined the parties' pension plans as third-party claimants. On April 10, 2013, the pension plans removed the related state court actions to federal court, asserting that the federal court had exclusive jurisdiction to hear claims under the Employee Retirement Income Security Act of 1974 (29 USC § 1001 et seq.) (ERISA). The federal court remanded the action back to state court because, as third-party claimants, the plans did not have standing to effectuate removal.

Trial of the dissolution action took place over seven days in February 2014.

On April 8, 2014, the trial court issued a detailed tentative ruling. The court invited the parties to specify controverted issues or make proposals for issues not covered by the ruling. Appellant and the pension plans filed a joint response to the court's tentative decision following trial, and appellant later filed a supplemental response. Respondent filed responses to these documents.

4

On June 27, 2014, respondent filed her final declaration of disclosure and current income and expense declaration.

On July 1, 2014, the trial court issued a nine-page final ruling.

On November 5, 2014, appellant filed his final declaration and current income and expense declaration.

On November 5, 2014, the trial court issued its order regarding attorney fees. The court declined to make a need based award, but noted that it cost respondent to litigate against the alleged mutual sharing agreement theory put forth by appellant. The court noted that appellant put on "virtually no evidence at all" regarding this alleged agreement. Because appellant persisted in arguing for the existence of the sharing agreement with insufficient evidence to support it, the court granted respondent $75,000 in attorney fees to be accounted for and paid as part of an equalization payment. The amount cited by the trial court took into account the fact that respondent's insistence that the Beverly Hills home was her separate property undoubtedly cost appellant some amount of fees.

On December 10, 2014, appellant filed written objections to the proposed judgment. Appellant argued, among other things, that several requests had been made to respondent regarding her disclosures, and respondent had refused to respond. Thus, appellant argued, the trial court could not enter judgment pursuant to section 2107.

On December 12, 2014, appellant filed a request for order regarding respondent's alleged noncompliance with section 2107. The hearing on appellant's request was set for January 20, 2015.

A further judgment on reserved issues was entered on December 22, 2014.

On January 14, 2015, the trial court advanced the hearing date on appellant's request for order, and issued an order. The court indicated that it had read and considered appellant's request for order for the production of all documents required under section 2107. The court ruled that because judgment was entered on December 22, 2014, appellant's request was moot. In addition, appellant's supplemental request, filed

January 5, 2015, to set aside the judgment was untimely. The request for order was denied.

Appellant filed another request for order on January 26, 2015, requesting that the judgment be set aside for noncompliance with section 2107. The first available date for hearing was February 25, 2015, which would have been after the time to file an appeal on the judgment had expired. Therefore, appellant filed an ex parte application seeking to advance the February 25, 2015 hearing date. The ex parte request was denied. Appellant withdrew the pending request for order.

On February 20, 2015, appellant filed a timely notice of appeal. Appellant appealed from both the judgment entered December 22, 2014, and the minute order of January 14, 2015, denying his request for order regarding noncompliance with section 2107.

## DISCUSSION

### I. Standard of review

We review the trial court's factual findings under the substantial evidence standard. Under this rule, the court's factual findings must be affirmed if they are supported by "substantial evidence." (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) We must accept as true the evidence most favorable to the order and assume that the trier of fact did not accept the contradictory evidence. (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.)

Attorney fee orders are reviewed for abuse of discretion. (*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1478; *In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 866). Abuse of discretion exists only when the court exceeds the bounds of reason. (*Marriage of Berland* (1989) 215 Cal.App.3d 1257, 1261.)

When no conflict in the evidence exists, a challenge to a court's jurisdiction is reviewed as a matter of law. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449.)

6

## II. Jurisdiction

Appellant's first argument is that the trial court lacked jurisdiction to conduct the trial due to the parties' failure to comply with section 2105. The statute mandates that the parties serve on each other a final declaration of disclosure no later than 45 days before the first assigned trial date. In the absence of compliance, appellant argues, the trial court lacked the jurisdiction to conduct the trial and to enter judgment. Appellant argues that the trial court was required to set aside the judgment due to the parties' noncompliance.

### A. Applicable law

Section 2105, subdivision (a) provides:

> "Except by court order or for good cause, before or at the time the parties enter into an agreement for the resolution of property or support issues other than pendente lite support, or, if the case goes to trial, no later than 45 days before the first assigned trial date, each party, or the attorney for the party in this matter, shall serve on the other party a final declaration of disclosure and a current income and expense declaration, executed under penalty of perjury . . . unless the parties mutually waive the final declaration of disclosure."

Section 2105, subdivision (d) permits the parties to waive the requirements of subdivision (a) "by execution of a waiver under penalty of perjury entered into in open court or by separate stipulation."

Section 2105, subdivision (c) provides that in making an order setting aside a judgment for failure to comply with this section, "the court may limit the set aside to those portions of the judgment materially affected by the nondisclosure."

Pursuant to section 2107, subdivision (d): "[I]f a court enters a judgment when the parties have failed to comply with all disclosure requirements of this chapter, the court shall set aside the judgment. The failure to comply with the disclosure requirements does not constitute harmless error."

### B. Relevant procedural history

First, we briefly review the relevant procedural facts in the proceedings below. Appellant is correct that neither party served the final declaration within the 45-day

pretrial deadline. Trial took place in February 2014, and neither party had served its final declaration at that time.

On April 8, 2014, the trial court issued its detailed tentative decision, which was not finalized until July 1, 2014.

Respondent's final disclosure declaration was served on June 27, 2014.

Appellant's final disclosure declaration was served on November 5, 2014.

The further judgment on reserved issues was entered on December 22, 2014.

### C. *Jurisdiction to proceed with trial*

Appellant has provided no authority for his position that the trial court lacked jurisdiction to proceed with trial in the absence of compliance with section 2105, subdivision (a). The statute requires that the final disclosure declarations be served no later than 45 days before the first trial date. However, it does not provide that a trial court lacks jurisdiction to proceed with trial in the absence of compliance with section 2105, subdivision (a). Instead, the Family Code provides that the trial court may not *enter judgment* if the parties failed to comply with the statutory requirements. (§§ 2105, subd. (c); 2107, subd. (d).)

At the time of trial, appellant did not object to the commencement of trial on the ground that the parties had not complied with section 2105, subdivision (a). By voluntarily participating in trial and failing to object, appellant forfeited his argument that the trial court lacked jurisdiction to proceed. (See, e.g., *Conservatorship of Joseph W.* (2011) 199 Cal.App.4th 953, 967 [where trial court misinterpreted request for hearing as request for court trial, appellant forfeited jury trial by failing to object and participating in trial]; *Zavala v. Board of Trustees* (1993) 16 Cal.App.4th 1755, 1761 [plaintiff forfeited any objection to defendants' failure to verify their answer when she did not object to defendant's failure to verify their answer before trial].)

"The term 'jurisdiction' . . . has so many different meanings that no single statement can be entirely satisfactory as a definition.' [Citation.] Essentially, jurisdictional errors are of two types. 'Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of

8

authority over the subject matter or the parties.' [Citation.] When a court lacks jurisdiction in a fundamental sense, an ensuing judgment is void, and 'thus vulnerable to direct or collateral attack at any time.' [Citation.]" (*People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 660.) However, appellant is not arguing that the trial court in this matter lacked fundamental jurisdiction. Instead, he argues that the trial court lacked the authority to act as it did.

> "'[T]he phrase "lack of jurisdiction" is not limited to these fundamental situations.' [Citation.] It may also 'be applied to a case where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no "jurisdiction" (or power) to act in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites.' [Citation.] '"[W]hen a statute authorizes [a] prescribed procedure, and the court acts contrary to the authority thus conferred, it has exceeded its jurisdiction."' [Citation.] [W]hen a court has fundamental jurisdiction, but acts in excess of its jurisdiction, its act or judgment is merely voidable. [Citations.] That is, its act or judgment is valid until it is set aside, and a party may be precluded from setting it aside by 'principles of estoppel, disfavor of collateral attack or res judicata.' [Citation.]"

(*People v. American Contractors Indemnity Co., supra*, 33 Cal.4th at p. 661.)

Appellant's claim that the trial court exceeded its jurisdiction falls under this second category of claims of lack of jurisdiction. There was no fundamental lack of jurisdiction over the parties or the subject matter. The court merely failed to act with the occurrence of certain procedural prerequisites. Under the circumstances, appellant was required to object at the trial level to give the trial court the opportunity in the first instance to correct the error. Because appellant failed to do so, he acquiesced in the error and forfeited his claim on appeal. (*People v. Braxton* (2004) 34 Cal.4th 798, 813 ["a party may not challenge on appeal a procedural error or omission if the party acquiesced by failing to object or protest" in the trial court].) ""In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them."' [Citations.]" (*Id.* At p.

9

814.) Appellant failed to call the judge's attention to the lack of compliance with section 2105 before trial. Therefore, he cannot now claim that the court's decision to proceed with the trial was error.

### D. Jurisdiction to enter judgment

Section 2107, subdivision (d) provides that if a court has entered judgment where the parties have failed to comply with all disclosure requirements, the trial court "shall" set aside that judgment.

The facts before us do not show that the trial court entered judgment prior to receiving respondent's final disclosure declaration. On June 16, 2014, when the parties appeared in court to discuss the objections to the court's preliminary statement of decision, the court stated: "I'm very troubled by the fact that there's no final declarations of disclosures, and the [appellant], apparently, is not going to waive his -- [appellant] is not going to waive [respondent's] final declaration of disclosure, so I can't enter judgment no matter what until there's that." Eleven days later, on June 27, 2014, respondent served the required document. The finalized judgment was not filed until July 1, 2014, after service of respondent's declaration, and a further judgment on reserved issues was not filed until nearly six months later in December 2014. Under these facts, the trial court was not required to set aside the judgment under section 2107, subdivision (d).

Appellant complains that respondent never provided certain supplemental disclosures that appellant requested in October 2014. Appellant contends that respondent's June 27, 2014 declaration of disclosure did not address previously undisclosed financial activity and assets. Appellant argues that he was entitled to receive the documents he requested in his request for supplemental disclosures. In his December 10, 2014 response to the court's order to show cause re: judgment, appellant pointed out to the court that respondent had not answered his requests regarding supplemental disclosures. Appellant included the following language in his response:

> "As set forth in the attached Declaration of [appellant's] attorney
> David Scott Kadin, several requests were made to [respondent's] attorney

10

for information and documentation regarding disclosures pursuant to California Family Code § 2107, and [respondent] has refused to respond or produce the information or documents. Therefore, pursuant to Family Code § 2107, the Court may not enter judgment, and if any judgment is entered, it shall be set aside."

A further judgment on reserved issues was entered on December 22, 2014. In its judgment, the trial court failed to explicitly address appellant's argument that the trial court was not permitted to enter judgment pursuant to section 2107. We interpret the court's failure to issue a formal ruling on this portion of appellant's response as an implied rejection of appellant's position. (*People v. Jacobs* (1987) 195 Cal.App.3d 1636, 1650-1651.)

We find that the trial court's implied disagreement with appellant's position was not error. Appellant provided no law supporting his position that the trial court was not permitted to enter judgment until respondent provided further information regarding her disclosure. Section 2107 provides no direction regarding requests for further information. Nor did appellant elaborate as to the specifics of what he was seeking and how such information could impact or change the outcome of the case in any respect. Because appellant provided no legal or factual basis for a delay of the judgment, the trial court did not err in implicitly denying appellant's request that the court refrain from entering judgment.

In sum, appellant has failed to show that the trial court lacked jurisdiction to enter judgment.[2]

### III. Appellant's requests for order

On December 12, 2014, appellant filed a request for order regarding respondent's alleged noncompliance with disclosure requirements. A hearing was set for January 20, 2015. On January 5, 2015, appellant filed a supplemental request. On January 14, 2015,

---

[2] Because we have determined that the trial court did not enter judgment in violation of sections 2105 and 2107, we decline to address the parties' competing arguments regarding the necessity of a showing of prejudice under section 2107, subdivision (d).

11

the trial court advanced the hearing date on appellant's request for order, and issued an order, indicating that it had read and considered appellant's request for order for the production of all documents required under section 2107. The court ruled that because judgment was entered on December 22, 2014, appellant's request was moot. In addition, appellant's supplemental request, filed January 5, 2015, was untimely. The request for order was denied.

Appellant does not provide any convincing legal authority that the trial court erred in determining that the request was moot after judgment was entered.[3] Appellant again relies on section 2107, which he explains, was "specifically and expressly written in contemplation that a judgment would, in fact, have issued and would, therefore, need to be set aside." However, appellant's December 12, 2014 request for order was not a motion to set aside the judgment.[4] Instead, it was a request for orders regarding noncompliance with disclosure requirements. Appellant cites no legal authority suggesting that such a request for order was not moot where final judgment in the case has already been rendered.

Appellant does not specifically challenge the trial court's determination that the supplemental request was untimely. He provides no rules regarding the timeliness of supplemental requests. Nor does he make any attempt to argue that the trial court abused its discretion in judging the document untimely under the particular circumstances of this case. Therefore, we decline to address this issue further. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["An appellant must provide an argument and

---

[3]    We reject appellant's position that "The Court essentially guaranteed that the Request for Order would be 'moot' by setting the hearing date after it would enter judgment, substantially prejudicing [appellant]." Appellant's suggestion that the trial court chose the hearing date based on a particular agenda against appellant is completely unsupported. In making this argument, appellant appears to agree that the request became moot, admitting that "the court set a hearing date that would inherently render it moot."

[4]    In fact, the request for order was filed before the final judgment on reserved issues was filed.

12

legal authority to support his contentions. This burden requires more than a mere assertion that the judgment is wrong. . . . It is not our place to construct theories or arguments to undermine the judgment and defeat the presumption of correctness"].)

Appellant filed a request for order on January 26, 2015, requesting that the judgment be set aside for noncompliance with section 2107. The first available date for hearing was February 25, 2015, which would have been after the time to file an appeal of the judgment had expired. Therefore, appellant filed an ex parte application seeking to advance the February 25, 2015 hearing date. The ex parte request was denied. Appellant timely filed his appeal from the judgment on February 20, 2015, and because the trial court lost jurisdiction with the filing of the appeal, appellant withdrew the pending request for order set for hearing on February 25, 2015.

Appellant argues that the filing of an ex parte application to advance the hearing date so as to avoid the running of the time to file an appeal was appropriate. Appellant cites California Rules of Court, rule 3.1202,[5] which provides that an ex parte application must make an affirmative factual showing of "irreparable harm, immediate danger, or any other statutory basis for granting relief ex parte." (Rule 3.1202(c).) Appellant fails to cite any legal authority suggesting that this particular situation qualified for ex parte relief. Appellant was not in danger of losing his right to appeal. While appellant has provided no legal authority on this question, we note that an order denying a postjudgment motion to vacate or set aside the judgment may be directly attacked on appeal. (*Sakaguchi v. Sakaguchi* (2009) 173 Cal.App.4th 852, 857, fn. 3 ["An order denying a motion to set aside the judgment is appealable, regardless of whether the time to appeal from the underlying judgment has expired"].) In addition, the decision whether to advance a hearing date is well within the trial court's discretion. (*Salinas v. Atchison, Topeka & Santa Fe Ry. Co.* (1992) 5 Cal.App.4th 1, 9.) We will not disturb such a ruling on appeal in the absence of an affirmative showing that the trial court acted outside the

---

[5]      In fact, appellant cited California Rules of Court, rule 3.2101, which does not appear to be a current rule, thus we assume this was unintended error.

13

bounds of reason.  Appellant has failed to provide the required showing to overturn the ruling.

Appellant has failed to show reversible error regarding the trial court's failure to make a determination as to whether the judgment should have been set aside under section 2107.  No timely request to set aside the judgment ever came before the court.

Because the trial court never considered a motion to set aside the judgment, there is no trial court ruling on the question for this court to evaluate.

In sum, appellant has failed to show error in the rulings on his requests for order.

## IV.  The alleged sharing agreement

Appellant next argues that the trial court erred in determining that no valid sharing agreement existed.  We analyze the trial court's decision under the substantial evidence standard of review.  (*Crail v. Blakely* (1973) 8 Cal.3d 744, 747.)  Under this standard, the trial court's decision must be upheld if it is supported by substantial evidence in the record as a whole.  (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1401.)

The trial court indicated that appellant bore the burden of proof regarding his contention that the parties entered into a sharing agreement dictating that all of their assets should be shared communally.  The trial court commented that there was "remarkably little evidence" concerning the agreement.  What little evidence there was consisted of appellant's testimony that the parties discussed an agreement to share their assets.  Appellant could not recall exactly when this agreement took place, but he testified that "it was discussed several times."  Subsequent to the parties' first divorce, appellant testified, the agreement was "reaffirmed."  Appellant testified that he was unsure whether the agreement was made during the first marriage or not.

The court found that there was no sharing agreement between the parties at any time.  There was insufficient detail as to the creation and the terms of the agreement, and that fact alone prevented enforcement of the agreement.  Further, the court explained:

> "To the extent that the agreement was entered into either before the parties' first marriage or between the parties' marriages, it must be in writing to be a valid pre-marital agreement; both parties agree that there is no such writing.  Additionally, if the agreement was reached during the

short pendency of the parties' first marriage, it would be a post-marital agreement, and there is a significant question as to whether this type of agreement is valid once the marriage ends. . . . As a result, the court does not find that the agreement would be valid under any legal theory."

The court further rejected any claim that the alleged agreement could be a "'Marvin' type arrangement."[6] The court reiterated that there were insufficient details of the agreement, and held "because in the case at bar there are simply no detailed terms or clearly identifiable agreements, the court cannot and will not enforce something that is this vague."

Appellant argues that the trial court erred by characterizing the agreement as an invalid pre-marital agreement. Section 1610 defines "premarital agreement" as "an agreement between prospective spouses made in contemplation of marriage and to be effective upon marriage." Section 1611 requires that any such agreement be in writing and signed by both parties. Appellant argues that he never testified that any agreement was made in contemplation of marriage. Instead, their agreement was made without any contemplation of a subsequent marriage. Appellant argues that the court's failure to recognize this distinction was error.

We find that the record does not support appellant's claim of error. The trial court was very clear that the evidence did not support the existence of an enforceable oral agreement to share under any theory. This was because there was insufficient detail as to the creation and terms of the agreement. The trial court mentioned that the agreement did not qualify as a valid pre-marital agreement only to specifically discard that particular theory. The court's rejection of the alleged sharing agreement as a valid pre-marital agreement served only to bolster the court's main finding that there was insufficient evidence to support appellant's claim that such an agreement existed.

In his reply brief, appellant argues that, at the very least, he showed an implied sharing agreement. In support of this argument, he cites two cases, *Alderson v. Alderson* (1986) 180 Cal.App.3d 450 (*Alderson*), and *Maglica v. Maglica* (1998) 66 Cal.App.4th

---

[6]     *Marvin v. Marvin* (1976) 18 Cal.3d 660.

15

442 (*Maglica*). Preliminarily, we note that appellant does not provide any citation to the record showing that he raised this argument at the trial court level or that the trial court considered this theory of an implied agreement to share based on these cases. It seems that appellant's position below was that he and respondent made an express sharing agreement. If the argument was not raised before the trial court, we need not consider it on appeal. This is especially true where, as here, the existence of an implied agreement to share is a heavily fact-based argument.

In addition, the cases cited by appellant are distinguishable. Both cases involved couples who cohabitated for long periods of time but never married. However, the couples held themselves out as married couples. Under those circumstances, courts of appeal have held that there could exist an implied agreement to share. However, the facts before us are different. Appellant does not argue that he and respondent held themselves out as husband and wife during the time that they were cohabitating. In addition, appellant and respondent did marry, twice, and the second time they were married for 15 years. Thus, unlike the parties in *Alderson* and *Maglica*, appellant and respondent legally changed the status of their relationship from one of long-term cohabitation to one of marriage.

*Alderson* and *Maglica* set forth certain factors which a fact finder may consider in determining whether a couple that engages in long-term cohabitation had an implied agreement to share. Those factors include: direct testimony of an agreement; the couple holding themselves out as husband and wife; the woman and her children taking the man's surname; the pooling of finances to purchase a number of joint rental properties; rendering services for those joint rental properties; and the nature of title taken in those properties. (*Maglica, supra*, 66 Cal.App.4th at p. 456.) However, even the existence of several of these factors does not mandate a finding of a sharing agreement. The *Maglica* court stated: "We certainly do not say that living together, holding themselves out as husband and wife, and being companions and confidants, even taken together, are *sufficient in and of themselves* to show an implied agreement." (*Id.* at pp. 456-457.) However, the court concluded, such facts "*can* be part of a series of facts which do show

16

such an agreement." (*Id.* at p. 457.) Here, the trial court noted that there was "remarkably little evidence" concerning an alleged agreement to share. To the extent that the trial court considered the existence of an implied agreement to share, its determination that no such implied agreement existed is supported by the record.

## V. Substantial evidence supported the trial court's division of property

Appellant argues that the trial court erred in dividing certain assets. Those assets include: the Beverly Hills home; the parties' pension plans; and artwork.

"'Appellate review of a trial court's finding that a particular item is separate or community property is limited to a determination of whether any substantial evidence supports the finding.' [Citations.]" (*In re Marriage of Rossin* (2009) 172 Cal.App.4th 725, 734.) "Generally speaking, property characterization depends on three factors: (1) the time of acquisition; (2) the 'operation of various presumptions, particularly those concerning the form of title'; and (3) the determination 'whether the spouses have transmuted' the property in question, thereby changing its character. . . . [i]n some cases, a fourth factor may be involved: whether the parties' actions short of formal transmutation have converted the property's character, as by commingling to the extent that tracing is impossible. [Citation.]" (*Id.* at p. 732.)

### A. The Beverly Hills home

At trial, each party claimed that the Beverly Hills residence was his or her separate property. The trial court determined that the Beverly Hills residence is the community property of the parties. The house was awarded to respondent, with an equalization payment to appellant in the amount of $505,079.65. The trial court explained:

> "According to the title, [respondent] alone originally purchased this property in 1982. However in October 1986, (before the second marriage) she deeded the property to: 'Lois O'Brien an unmarried woman and Ray W. Exley, an unmarried man' (exhibit 119). Then, in November, 1992 (after marriage) they granted the property as unmarried persons to themselves as 'husband and wife as joint tenants' (exhibit 128). In 2002 the parties refinanced the property, leaving title in both their names. In 2003, the house was again refinanced, but this time into [respondent's] name only."

17

While there was much testimony regarding the source of the down payment, there was little documentary evidence. The trial court determined that "[n]either party sufficiently traced money into this house for the court to make any determination as to the source of funds." The court noted that while the property was initially purchased in respondent's name, "both well before marriage and immediately after marriage the title to the property was placed in the parties joint names." Therefore, a presumption arose that the property was community in nature. Although appellant's name was taken off the title when the house was refinanced, it was respondent's burden to demonstrate that she did not exercise undue influence in this transaction. There was evidence that appellant's name was removed from the title "as a result of his credit score as part of the refinance." The trial court indicated that respondent did not meaningfully refute this evidence. Thus, the property remained community property in spite of the change in title.

Appellant argues that the evidence strongly supports a determination that the house was purchased with his separate property. In addition, appellant argues, all of the loans obtained for the purchase came from appellant's pension plans.[7] Appellant argues that the house could only have become a community property asset once the parties were married, and that the court failed to determine the value of the house at the time of marriage and make an appropriate apportionment.

A review of the evidence shows conflicting testimony from appellant and respondent as to the source of funds for the down payment of the house as well as the payments. However, it was undisputed that the house was the parties' primary residence starting in 1982, when the home was first purchased, through 2007 when respondent moved out. In addition, the trial court appropriately considered the form of title to the property, noting that the property was in the parties' joint names "both well before

---

[7]     Appellant fails to cite any evidence in support of his contention that the entire down payment for the Beverly Hills home was his separate property. While respondent testified that the purchase was partially funded with money that was borrowed from the Athena pension plans, respondent also testified that her income was the source of funds for the payments on the loans.

18

marriage and immediately after marriage," and that this created a presumption of community property.

Our role at this stage is not to reweigh the evidence, but to examine the evidence in the light most favorable to the prevailing party and assume that the trial court rejected contradictory evidence. (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1151.) We find that substantial evidence supported the trial court's decision that the Beverly Hills Residence was community property.

### B. The pension plans

In 1978, appellant formed Athena Medical Group, Inc. (Athena), a California Corporation. Appellant and respondent were co-owners. Respondent was listed as an officer and employee of the corporation in order to establish the two requisite employees necessary to form a "Qualified ERISA" employee pension and benefit plan. Appellant and respondent were both employed by Athena, and respondent remained an employee through 1982. The corporation was established to hold earnings as well as two pension plans, also established in 1978, for the purpose of reducing tax liability.

In 1983, respondent started her own professional corporation, California Professional Medical Group (CPMG), with its own ERISA plan. Appellant was employed as the secretary/treasurer of the corporation. Appellant was also a beneficiary of the CPMG ERISA pension plan just as respondent was a beneficiary of the Athena plans.

In early 1990, before the parties' second marriage, they elected to hold their assets in individual retirement accounts (IRAs) instead of ERISA-qualified plans. Accordingly, nearly all of the assets held by the parties in the Athena and CPMG pension plans were rolled over into IRAs held separately in each party's name.

The trial court noted that the evidence during trial regarding the parties' pension plans was "quite confusing." However, to the extent that the Athena pension plans still had some existing value, the court confirmed the Athena plans to appellant as his sole and separate property. In addition, three pieces of artwork which were purchased by

19

appellant's pension plan were awarded to appellant as his separate property.[8] The court found that the pension plans were eventually rolled over into individual IRAs in the parties' names. Respondent admitted to depositing $8,000 of community property into her IRA, and the court ordered her to reimburse the community that amount. Apart from that reimbursement, the court confirmed the IRA in each person's name to that person as his or her sole and separate property.

Appellant argues the evidence showed that the Athena plans had more value than the CPMG plan, yet no effort was made to establish the value of those plans. Appellant argues that if any money from appellant's ERISA plan was rolled over into respondent's IRA, respondent would need to reimburse appellant for that money.[9] Appellant complains that the trial court made no effort to value the plans in order to make any necessary equalizing payment. Without the information sought in his requests for supplemental disclosures, there was no way to establish how much, if anything, was owed.

---

[8]     An additional piece of artwork purchased by the pension plan, "Two Heads" by David Park, was sold for fees and is discussed in section D below.

[9]     Appellant contends, without citation to the record, that "all the assets of merit came from Athena." Appellant states that this includes all assets later rolled into IRAs, insurance policies/plans purchased by Athena, all of the artwork, and respondents' Huntington Beach trailer park investment. Appellant contends that all these assets should have been found to be the sole and separate property of appellant. Appellant provides no citations to any evidence supporting this claim. Respondent testified that she purchased the artwork and was not reimbursed by Athena. The trial court was entitled to believe her. Similarly, the evidence showed that respondent created and funded her IRA when the parties were unmarried, and that she purchased the investment in Huntington Mobile Estates using her personal income.

Appellant has the burden to affirmatively show error, including deficiencies in the evidence. When arguing insufficiency of the evidence, appellant is required to support his argument with "a fair and adequate statement of the evidence which is claimed to be insufficient." (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.) In the absence of a clear argument supported by specific evidence, we decline to address these claims further. (*Ibid.*)

We have previously addressed appellant's argument that judgment should not have been entered in the absence of compliance with section 2105.  To the extent that these issues were not addressed by the trial court, it was appellant's obligation to raise them by means of an appropriate and timely request.  There is no error in the trial court's determination that respondent's IRA, which was funded before marriage, constituted her sole and separate property.[10]

### C.  Artwork

Respondent purchased over 50 pieces of art prior to the parties' second marriage.  The trial court awarded these works to respondent as her sole and separate property "as the evidence supports the fact that [respondent] purchased these pieces between marriages and the [appellant] failed to prove that the money came from him."  There was no error in the trial court's determination that this personal property acquired by respondent prior to marriage was her sole and separate property.

Appellant argues that respondent produced no evidence of purchase; that the evidence of her income at the time does not support the claim that she purchased all of the art with her own money; and that no significant purchases took place after appellant retired, suggesting that his income was the source of money for these purchases.

As set forth above, we do not reweigh the evidence or assess credibility at the appellate level.  (*Westphal v. Wal-Mart Stores, Inc*. (1998) 68 Cal.App.4th 1071, 1078).  The trial court was entitled to believe respondent's testimony that she purchased the artwork with her own money and that appellant never reimbursed her for any of the artwork.

### D.  The "Two Heads" painting

The "Two Heads" painting was purchased by respondent and the pension plans in June of 1983 for $9,372.  Respondent paid $1,000 with a personal check and the pension plans paid the balance.  In June 1991, before the second marriage, appellant transferred

---

[10]     With the exception of the $8,000 that respondent was ordered to return to the community.

21

the Two Heads painting and three other pieces of art from Athena to himself in his individual capacity.

Two Heads was sold at auction after separation for $1 million, yielding a profit of approximately $800,000. Pursuant to various stipulations of the parties, the money obtained from the sale of Two Heads was used to pay attorney fees and costs incurred in the dissolution action, subject to reallocation if necessary.

In its final ruling on attorney fees, issued November 5, 2014, the trial court determined that a reallocation of the proceeds of the sale of Two Heads was inappropriate. The court stated: "From the court's perspective, this painting was sold for fees and the money, in excess of $800,000 has now been spent. Regardless of the ownership of the painting, it is just in this matter that the fee award not be disturbed or reallocated in any way. As a result, the court does not order reimbursement to any party or the pension plan from the sale of this painting."

Appellant argues that because the court found no sharing agreement, the Two Heads painting was his separate property. Thus, he argues, respondent owes him reimbursement for the amount applied to her attorney fees from the sale. Appellant does not specify how much of the $800,000 was spent on respondent's attorney fees.

Because the proceeds of the Two Heads painting were used for attorney fees, the trial court's decision not to require reallocation is reviewed for abuse of discretion. (*Cruz v. Ayromloo* (2007) 155 Cal.App.4th 1270, 1274 ["[a] trial court order awarding attorney fees is 'reviewed using the abuse of discretion standard. [Citation.]'"], fn. omitted.) It is appellant's burden to show an affirmative showing of abuse of discretion, and we presume that the court's decision was correct. (*Ibid.*)

Appellant has failed to show that the trial court abused its discretion in declining to require a reallocation. Appellant's argument is simply that because the trial court determined that there was no sharing agreement, the Two Heads painting was his separate property and thus respondent should be required to reimburse him $400,000. Appellant glosses over the complexity of this issue. He fails to provide any information concerning how much he spent on attorney fees, how much respondent spent on attorney fees, and

utterly fails to argue in what way the trial court abused its discretion in determining that no reallocation was necessary. Under the circumstances, we will not disturb the trial court's decision.

## VI. Attorney fees

The court noted that the fees in this matter were "very high and the issues somewhat convoluted." The court concluded: "On balance, the court feels that with one limited exception, each party is obligated to bear their own fees in this matter."

The exception was the fees that respondent incurred to defend against the alleged sharing agreement. The court stated: "There is no doubt that the [appellant] cost the [respondent] fees to litigate the 'mutual sharing' agreement. . . . What evidence was put on did not and cannot support an agreement for many reasons. . . . In light of the fact that [appellant] persisted in the sharing agreement, even when there was truly insufficient evidence to support it, the court awards fees from the [appellant] to the [respondent] in the amount of $75,000 to be accounted for and paid as part of the equalization payment."

Appellant sought fees under section 271, which permits the trial court to base an award of attorney's fees and costs "on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation." Appellant argued that the court should award him fees for respondent's breach of fiduciary duty in maintaining the position that the Beverly Hills home was her separate property. The trial court agreed that appellant incurred fees "unnecessarily" on this issue. However, the court concluded that "the amount of fees spent on this issue is far overshadowed by the fees the [respondent] incurred in litigating the 'mutual sharing agreement.'" As a result, the court declined to award appellant any fees.

It was well within the trial court's discretion to determine that the amount of fees respondent incurred defending against the alleged sharing agreement far outweighed the amount of fees appellant incurred defending his interest in the Beverly Hills home. Appellant provides no dollar amounts comparing the amount of attorney fees it cost each party to litigate these issues. In the absence of an affirmative showing that the trial

23

court's attorney fee allocation was beyond the bounds of reason, we will not disturb it. (*Cruz v. Ayromloo, supra*, 155 Cal.App.4th at p. 1274.)

Appellant cites *In re Marriage of Fossum* (2011) 192 Cal.App.4th 336 (*Fossum*), which held that a court does not have the discretion to deny fees to a spouse under section 1101, subdivision (g) where the other spouse has breached a fiduciary duty under section 721.[11]  The *Fossum* court held that the language of section 1101, subdivision (g) is "unambiguous and mandatory." (*Id.* at p. 348.)  Because a breach of fiduciary duty under section 721 had been shown by the wife's action in charging money to a credit card without disclosing the charge to her husband, the trial court erred in denying an award to the husband for the attorney fees attributable to her violation. (*Ibid.*)

Here, appellant is seeking fees because respondent took the position that the Beverly Hills home was her separate property based on the title of the property. Respondent's position was wrong, as the Beverly Hills home was found to be community property.  Unlike the wife in *Fossum*, the record does not support a finding that respondent undertook a transaction which specifically impaired a community asset in violation of section 721.  Nor did the trial court make any such finding.  Thus, we find the discussion of section 1101, subdivision (g) in *Fossum* to be inapplicable.[12]

---

[11]  Section 1101, subdivision (g) states:  "Remedies for breach of the fiduciary duty by one spouse, including those set out in Sections 721 and 1100, shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs."

Section 721 provides, in part, that transactions between spouses "are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other." (§ 721, subd. (b).)

[12]  In *Fossum*, the husband had caused the wife to quitclaim her interest in the community residence to the husband to facilitate a lower interest rate on a refinance. (*Fossum, supra*, 192 Cal.App.4th at pp. 338-339.)  The court held that the residence was presumptively community property because it was purchased during marriage, and found that the wife's quitclaim was subject to the rebuttable presumption of undue influence, which the husband failed to rebut. (*Id.* at p. 345.)  The court's decision that the family residence in *Fossum* was community property was affirmed on appeal.  The trial court in

24

Appellant further argues that the trial court erred in finding section 1101, subdivisions (g) and (h) inapplicable.**13** Again, appellant refers to respondent's claim that the Beverly Hills home was her sole, separate property.

Appellant has failed to provide a citation to the record showing that the trial court considered or addressed the application of section 1101 to the facts of this case. "It is well-established that '"[i]f a party fails to support an argument with the necessary citations to the record, . . . the argument [will be] deemed to have been waived. [Citation.]"' [Citation.] This rule applies to matters referenced at any point in the brief, not just in the statement of facts. [Citation.]" (*Conservatorship of Kevin A.* (2015) 240 Cal.App.4th 1241, 1253, fn. omitted.) Without reference to any discussion of this statute in the record below, we decline to address appellant's argument.

We note that to the extent that the trial court made an implied finding that respondent did not breach her fiduciary duties to appellant by impairing an asset, appellant has failed to affirmatively show that such a finding was error. As explained above, respondent's action in refinancing the house to her name alone was apparently undertaken as a condition of the refinance due to appellant's lower credit score, not as an act of fraud or breach of fiduciary duty. Appellant has failed to show error.

---

this matter reached the exact same conclusion under similar circumstances. Thus, *Fossum* merely confirms the trial court's action with respect to the community home, and does not assist appellant's argument that sanctions were warranted under section 1101.

**13** Section 1101, subdivision (h), provides that where a spouse's breach of fiduciary duty falls within the ambit of Civil Code section 3294, remedies shall include an award to the other spouse of 100 percent of any asset transferred in breach of the fiduciary duty. The trial court found that respondent's actions concerning the Beverly Hills house did not rise to the level of a violation of Civil Code section 3294. Thus, Family Code section 1101, subdivision (h) is inapplicable.

25

**DISPOSITION**

The judgment is affirmed.  Respondent is awarded her costs of appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ


We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST